UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

JAMES PEASE,

    Plaintiff,

  v.                                Case No. 20-CV-103

WHITEWATER UNIFIED SCHOOL DISTRICT and
MARK ELWORTHY,

    Defendants.

---

### DECISION AND ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

James Pease sues his former employer, the Whitewater Unified School District ("WUSD") and WUSD's former District Administrator, Mark Elworthy, for retaliation under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 ("Title IX"). Pease also brings several claims under Wisconsin law, including breach of contract, wrongful discharge in violation of public policy, and defamation. Defendants move for summary judgment in their favor as to all of Pease's claims. For the reasons explained below, defendants' motion for summary judgment is granted as to Pease's IX retaliation claim. I will decline to exercise supplemental jurisdiction over Pease's remaining state law claims.

### FACTS

Pease was hired by the WUSD in 2015 to serve as Whitewater High School's baseball coach. (Defendants' Proposed Findings of Fact ("DPFOF") ¶ 1, Docket # 65 and Plaintiff's Response to DPFOF ("Pl.'s Resp.") ¶ 1, Docket # 80.) In Fall 2018, Pease became the school's athletic director for the 2018-2019 school year. (Sept. 24, 2020

Deposition of James Pease ("Sept. Pease Dep.") at 158, Docket # 16.) On February 25, 2019, the School Board extended a letter of intent to Pease to continue his position as athletic director for the 2019-2020 school year, contingent on the development and execution of a written contract. (DPFOF ¶ 7 and Pl.'s Resp. ¶ 7.)

Although he could not recall the exact date, Pease testified that in early 2019, he, along with Whitewater High School's principal, Michael Lovenberg, determined that there were "soft spots" on the gymnastics flooring used by the girls' gymnastics team, meaning that when one walked across the floor, it was uneven and thus unsafe for use. (Sept. Pease Dep. at 24–25.) Pease testified that he and Lovenberg showed the floor to School Board President Casey Judd, who agreed it was unsafe. (*Id.* at 25.) Pease testified that he and Lovenberg decided to talk to Elworthy about the condition of the floor, stating that it was unsafe and could no longer be used. (*Id.* at 27.) Pease testified that he, Lovenberg, and Elworthy discussed several options to address the flooring issue, including purchasing a new floor out of the athletics budget, replacing girls' gymnastics with girls' golf, or creating a co-op with another high school's gymnastics team. (*Id.* at 27–31.)

None of these options were ideal. Pease testified that he contacted multiple places to get pricing and learned that new flooring would cost approximately $23,000.00 (*id.* at 34–35), which would take too great a percentage out of the athletics budget (*id.* at 47–48). Pease, Lovenberg, and Elworthy determined that replacing girls' gymnastics with girls' golf was also not viable, given the two sports were played in different seasons as well as other issues with timely obtaining permission from the Wisconsin Interscholastic Athletic Association ("WIAA"). (Declaration of Elizabeth C. Stephens ("Stephens Decl.") ¶ 25, Ex. W, Deposition of Mike Lovenberg ("Lovenberg Dep.") at 33, Docket # 63-23.) This left the

idea of creating a co-op with another high school. Pease testified that this seemed to be the only viable option, but was far from the best solution. (Sept. Pease Dep. at 48.) Pease explored creating a co-op with Jefferson High School. (*Id.* at 36.) Creating a co-op, however, can take several years of planning (Stephens Decl. ¶ 15, Ex. M, Feb. 5, 2021 Deposition of Mark Elworthy ("Feb. 5 Elworthy Dep") at 139–40, Docket # 63-13) as it requires approval by both schools' School Boards and the WIAA (Sept. Pease Dep. at 71).

Between March 8, 2019 and March 18, 2019 (the next scheduled School Board meeting), Whitewater High School's Assistant Principal Nathan O'Shaughnessy and Pease met with parents of the District's gymnasts to discuss the co-op proposal. (DPFOF ¶ 21 and Pl.'s Resp. ¶ 21.) Pease asserts that Elworthy instructed them not to discuss the condition of the gymnastics floor, the cost of the floor, or the connection between the floor's condition and the co-op proposal, with the parents. (Pl.'s Resp. ¶ 21.) School Board members received negative feedback about the co-op proposal, including from Whitewater High School's Head Gymnastics Coach, Kelly O'Hara. (Stephens Decl. ¶ 18, Ex. P, Docket # 63-16.) As a result of this negative feedback, Elworthy sent an email on the afternoon of March 18, 2019 requesting that the co-op proposal be pulled from the School Board meeting agenda and stating that "Jim [Pease] will bring forth a capital needs summary for athletics which will include the gymnastics floor." (Docket # 63-16 at 1.) Lovenberg, however, subsequently requested that the co-op proposal be placed back on the agenda. (Stephens Decl. ¶ 9, Ex. G, Docket # 63-7.)

The co-op proposal was presented at the Whitewater School Board meeting on March 18, 2019, but was rejected by the Board. (DPFOF ¶ 29 and Pl.'s Resp. ¶ 29.) A new gymnastics floor was ultimately funded through the District's general budget (Stephens

3

Decl. ¶ 16, Ex. N, Deposition of Matthew Sylvester-Knudtson ("Knudtson Decl.") at 11–13, Docket # 63-14), and was approved on April 30, 2019 (Stephens Decl. ¶ 14, Ex. L, Docket # 63-12).

Pease asserts that two days after the March 18, 2019 School Board meeting, Elworthy began circulating and soliciting complaints against him. (DPFOF ¶ 34 and Pl.'s Resp. ¶ 34.) Elworthy testified that he asked David Brokopp, principal of Lakeview Elementary School, to look into complaints made to the District about Pease. (Elworthy Dep. at 39, 42–57.) Brokopp testified that he authored a document on or around May 16, 2019, summarizing notes from his interview with parents and students. (Declaration of Ben Hitchcock Cross ¶ 4, 6, Ex. A, August 27, 2021 Deposition of David Brokopp ("Aug. Brokopp Dep.") at 15–16, Docket # 55-1, Ex. 1; Stephens Decl. ¶ 26, Ex. X, Docket # 63-24.) Brokopp's notes reflected that several parents and students had accused Pease's son of bullying other students and had expressed concerns about Pease's "unethical and unbecoming behavior." (Docket # 63-24.) Elworthy testified, however, that he did not see Brokopp's document until June 2019. (Feb. 5 Elworthy Dep. at 42.)

Matthew Sylvester-Knudtson, the Whitewater School District's Director of Business Services, testified that he and Elworthy were contacted by Kim Devitt (who was Pease's secretary at the time) (Lovenberg Dep. at 152) sometime in May 2019, asking to meet regarding concerns she had with Pease (Knudtson Dep. at 16–17). Sylvester-Knudtson, Elworthy, and Devitt met on May 20, 2019, for approximately one hour. (*Id.* at 30; Feb. 5 Elworthy Dep. at 106.) Devitt raised "ethical issues" she states that she saw throughout the year, such as "code violations, eligibility issues, certain kids [sic] grades being overlooked, and the way certain things that needed to be done would be overlooked if it was not a

4

'priority' of the [Athletic Director]." (Stephens Decl. ¶ 19, Ex. Q, Docket # 63-17; Feb. 26, 2021 Deposition of Mark Elworthy at 271, 316, Ex. 13, Docket # 63-13.) Sylvester-Knudtson testified that he believed the concerns Devitt raised were "pretty serious," especially allowing students to compete who should not have been competing. (Knudtson Dep. at 102.) Sylvester-Knudtson testified that after meeting with Devitt at the central district office, he and Elworthy traveled to Whitewater High School, briefly met with Lovenberg, and then asked Lovenberg to bring Pease into his office. (*Id.* at 26.) Pease was immediately placed on paid administrative leave. (*Id.* at 108.) Sylvester-Knudtson testified that the primary reason Pease was immediately placed on leave was because of the alleged WIAA violations, i.e., that "[Pease] could potentially . . . manipulate information or modify . . . code violations." (*Id.* at 102–03.) Elworthy confirmed that it was Devitt's allegations that triggered Pease's May 20, 2019 suspension. (Feb. 5 Elworthy Dep. at 118–19.)

Elworthy testified that he allowed Pease to record their conversation on May 21, 2019. (Feb. 5 Elworthy Dep. at 173.) During this conversation, Elworthy testified that Pease made statements regarding resigning his position and the District offered Pease the option of voluntarily resigning to end the investigation. (*Id.* at 173–74.) On May 23, 2019, Pease sent Elworthy an email stating that "In regards to my resignation I wanted to let you know that a representative for me will be reaching out to you to move this forward." (Stephens Decl. ¶ 22, Ex. T, Docket # 63-20; Declaration of Andrew Roland ¶ 3, Docket # 89.)[1] On May 28,

---

[1] Defendants initially attached this email to Attorney Stephens' declaration, and Stephens, as counsel for defendants, purported to authenticate this document. (Stephens Decl. ¶ 22.) But Stephens cannot properly authenticate this email. In an attempt to remedy this error, defendants subsequently submitted the declaration of the WUSD's former Director of Technology, Andrew Rowland, to authenticate the email referenced in paragraph 22 of Stephens' Declaration. (*See* Declaration of Andrew Roland ¶ 3, Docket # 89.) Defendants move for leave to amend their PFOF with this new declaration. (Docket # 88.) Despite the declaration's tardiness, I will grant defendants' motion. It should be noted that Pease, while objecting to Attorney Stephens'

5

2019 at approximately 4:30 p.m., an article appeared in Jefferson County's Daily Union newspaper stating that "Jim Pease is no longer the athletic director at Whitewater High School, district officials confirmed Tuesday afternoon." (DPFOF ¶ 49 and Pl.'s Resp. ¶ 49.) Pease contends that he submitted his resignation on May 28, 2019 at 6:04 p.m. after reading the article in the Daily Union stating that he was no longer employed by the District. (*Id.* ¶ 51 and Pl.'s Resp. at ¶ 51.)

## SUMMARY JUDGMENT STANDARD

The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. The mere existence of some factual dispute does not defeat a summary judgment motion. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*.

In evaluating a motion for summary judgment, the court must draw all inferences in a light most favorable to the nonmovant. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Celotex Corp.*, 477 U.S. at 324. Evidence relied upon must be of a type that would be admissible at trial. *See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). To survive summary judgment, a party cannot rely on his pleadings and

---

purported authentication of the email, did not deny making the statement in the email. (Pl.'s Resp. to DPFOF ¶ 49.)

"must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. "In short, 'summary judgment is appropriate if, on the record as a whole, a rational trier of fact could not find for the non-moving party.'" *Durkin v. Equifax Check Services, Inc.*, 406 F.3d 410, 414 (7th Cir. 2005) (citing *Turner v. J.V.D.B. & Assoc., Inc.*, 330 F.3d 991, 994 (7th Cir. 2003)).

**ANALYSIS**

Pease sues the WUSD and Elworthy for retaliation under Title IX, as well as for breach of contract, wrongful discharge, and defamation under Wisconsin state law. I will address each claim in turn.

1. *Retaliation Under Title IX*

Title IX prohibits sex discrimination by recipients of federal education funding. The statute provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). In *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167 (2005), the Supreme Court determined that Title IX's private right of action encompasses suits for retaliation, "because retaliation falls within the statute's prohibition of intentional discrimination on the basis of sex." *Id.* at 178. The Court further determined that because Title IX is a broadly worded statute, it does not require that the victim of the retaliation also be the victim of the discrimination that is the subject of the original complaint. *Id.* at 179. The Court stated that:

> Where the retaliation occurs because the complainant speaks out about sex discrimination, the "on the basis of sex" requirement is satisfied. The complainant is himself a victim of discriminatory retaliation, regardless of whether he was the subject of the original complaint. As we explain above, *see supra*, at 1505–1506, this is consistent with *Sullivan [v. Little Hunting Park, Inc.*,

7

> 396 U.S. 229 (1969)] which formed an important part of the backdrop against which Congress enacted Title IX. *Sullivan* made clear that retaliation claims extend to those who oppose discrimination against others.

*Id.* at 179–80. The Court noted that "teachers and coaches" are "often in the best position to vindicate the rights of their students because they are better able to identify discrimination and bring it to the attention of administrators." *Id.* at 181. To prove retaliation under Title IX, Pease must produce enough evidence for a reasonable jury to conclude that: (1) he engaged in a statutorily protected activity; (2) the defendants took a materially adverse action against him; and (3) there existed a but-for causal connection between the two. *See Burton v. Bd. of Regents of Univ. of Wisconsin Sys.*, 851 F.3d 690, 695 (7th Cir. 2017); *see also Jackson*, 544 U.S. at 184 ("To prevail on the merits, Jackson will have to prove that the Board retaliated against him because he complained of sex discrimination.").

In *Ortiz v. Werner Enter. Inc.*, 834 F.3d 760 (7th Cir. 2016), the Court of Appeals found that in analyzing discrimination claims, the evidence "must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself—or whether just the 'direct' evidence does so, or the 'indirect' evidence." *Id.* at 764. *See Lewis v. Wilkie*, 909 F.3d 858, 867 n.2 (7th Cir. 2018) ("Although *Ortiz* dealt generally with employment discrimination claims, we have applied its holding in the context of retaliation claims as well."). While *Ortiz* disposes of the distinction between "direct" and "indirect" evidence, it does not affect the *McDonnell Douglas* burden shifting framework. 834 F.3d at 766; *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Thus, "to the extent [plaintiff] wants to take advantage of it, [he] retains the initial burden of establishing a *prima facie* case of discrimination." *Mourning v. Ternes Packaging, Indiana, Inc.*, 868 F.3d 568, 570–71 (7th Cir. 2017).

### 1.1 Whether Pease Engaged in a Statutorily Protected Activity

Defendants argue that Pease cannot succeed on his Title IX retaliation claim because he cannot show that he engaged in a statutorily protected activity. (Defs.' Br. at 5–11, Docket # 64.) "A retaliation claim requires statutorily protected activity, which generally involves subjective and objective factors." *Scheidler v. Indiana*, 914 F.3d 535, 542 (7th Cir. 2019). The plaintiff must not only have a subjective (sincere, good faith) belief that he opposed an unlawful practice; his belief must also be objectively reasonable, which means that the complaint must involve discrimination prohibited by the statute. *See Hamner v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 224 F.3d 701, 707 (7th Cir. 2000), *overruled on other grounds by Hively v. Ivy Tech Cmty. Coll. of Indiana*, 853 F.3d 339 (7th Cir. 2017).

Pease argues that his discussions with Elworthy in the wake of discovering the dangerous condition of the gymnastics flooring were "inextricably intertwined with Title IX because without the floor there was no gymnastics, and without gymnastics the District could be out of compliance with Title IX." (Pl.'s Br. in Opp. at 16–20, Docket # 83.) Pease testified that whenever educators address the loss of a sport, they face a potential Title IX problem. (Sept. Pease Dep. at 134–36.) Pease testified that he believed that he raised concerns about Title IX "about the floor having to come out of my budget." (*Id.* at 137.)

But the record evidence does not support that Pease had either a subjective belief that he was opposing an unlawful practice or that even if he did, any such belief would be objectively reasonable. Title IX prohibits the exclusion from participation in a program receiving federal financial assistance on the basis of sex. Pease testified that he was concerned about the potential loss of girls' gymnastics due to the flooring issue. However, when Pease raised the issue of the unusable condition of the girls' gymnastics floor, he

9

testified that he, Elworthy, and Lovenberg brainstormed possible options to remedy the issue, including purchasing a new floor out of the athletics budget, replacing girls' gymnastics with girls' golf, or creating a co-op with another high school's gymnastics team. (Sept. Pease Dep. at 27–31.) Again, while Pease testifies that Title IX compliance was always at play with budgetary issues (*id.* at 134–36), he does not testify that either Elworthy or the WUSD were attempting to disband girls' gymnastics. Rather, he testified that they were trying to come up with a solution to the unsafe flooring, even if none of the proposed solutions discussed at the time were ideal. (*Id.* at 45, 48.) Ultimately, prior to Pease's May 28, 2019 separation with the District, funding for a new gymnastics floor was approved (Knudtson Dep. at 11–13) and Whitewater High School did not lose girls' gymnastics at any point.

Regarding his protected activity, Pease argues that Title IX does not require him to use any "magic word" such as "sex" or "gender discrimination" to bring his activity within the definition of protected activity. (Pl.'s Br. in Opp. at 15.) While it is true that there is no "magic word" requirement, *see Sitar v. Indiana Dep't of Transp.*, 344 F.3d 720, 727 (7th Cir. 2003), an employee must "'at least say something to indicate [ ] [gender] is an issue,'" *id.* (quoting *Miller v. Am. Fam. Mut. Ins. Co.*, 203 F.3d 997, 1008 (7th Cir. 2000)). Pease cites an unpublished Seventh Circuit case, *Swinney v. Illinois State Police*, 332 F. App'x 316 (7th Cir. 2009), in support of his argument. (Pl.'s Br. in Opp. at 15.) I agree that *Swinney* is instructive, but ultimately unhelpful to Pease's position. In *Swinney*, plaintiff sued her former employer, alleging that she was retaliated against for complaining about sexual harassment in violation of Title VII. *Id.* at 317. Plaintiff's supervisor forwarded four emails to plaintiff and several other employees that contained sexually-themed jokes. *Id.* The

supervisor's boss received at least one of the emails and told plaintiff's supervisor the emails were inappropriate for the workplace and to discontinue sending them. *Id.*

Months later, plaintiff received a largely positive evaluation. *Id.* Later that month, plaintiff reported to a higher-up supervisor that she felt harassed and intimated by her supervisor. She showed this supervisor two of the emails previously sent, stating that she thought her supervisor might have been trying to harass and intimidate her with the emails. *Id.* Plaintiff alleged that after the meeting, her workload increased and she was yelled at by her supervisors about her job performance. *Id.* Plaintiff was later diagnosed with PTSD and took a leave of absence, ultimately not returning to work. *Id.*

Defendant argued that plaintiff did not engage in a statutorily protected activity. *Id.* Plaintiff countered that although she did not tell the higher-up supervisor that she felt sexually harassed, she asserted that "it should have been obvious" from the emails' contents that she was complaining about sexual harassment. *Id.* The court of appeals disagreed. While acknowledging that plaintiff did not need to use any "magic word" to complain of sex discrimination, the court found that the plaintiff did need to "say something to make clear to [the supervisor] that sex was an issue." *Id.* at 318. The court of appeals found that while plaintiff argued the supervisor should have known she was complaining of sexual harassment, "we do not consider what employers should have known about complaints, and instead hold them responsible for what the record shows they actually knew." *Id.*

Similar to the plaintiff in *Swinney*, Pease argues that whenever a school's athletics budget comes up, it raises a potential Title IX issue. And the issue he was addressing effected a girls' sport. In other words, like the plaintiff in Swinney, Pease argues that Elworthy and the WUSD *should have known* that Pease was complaining about sex

11

discrimination simply because it was a budget issue involving a girls' sport. But absolutely nothing in the record supports that Pease gave any indication that he was complaining of a Title IX violation. Rather, it appears he and others working for the District, including Elworthy, were working together to *avoid* a potential Title IX violation. For these reasons, Pease has failed to produce evidence from which a jury could conclude that the defendants were aware that he was complaining of sex discrimination in violation of Title IX. Because Pease cannot meet this element of his retaliation claim, the claim fails.

### 1.2 Adverse Employment Action

Even assuming, *arguendo*, that Pease engaged in a statutorily protected activity, his Title IX retaliation claim would still fail because he has not shown an adverse employment action. Pease contends that his May 28, 2019 resignation amounted to constructive discharge. (Pl.'s Br. in Opp. at 20–29.) As an initial matter, defendants argue that "constructive discharge" is not, itself, an adverse employment action, (*see* Defs.' Reply Br. at 11, Docket # 84). Defendants are incorrect. It should be noted that defendants cite to the dissent of *Pennsylvania State Police v. Suders*, 542 U.S. 129 (2004) in support of their argument. (*Id.* citing *Suders*, 524 U.S. at 153–54 (Thomas, J., dissenting).) It should not need to be said that a dissenting opinion does not create binding precedent. And the majority opinion specifically held that a constructive discharge constitutes an adverse employment action. *See id.* at 147; *see also Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 679 (7th Cir. 2010) ("A constructive discharge constitutes an adverse employment action.").

However, Pease's articulation of the standard for constructive discharge is also not entirely correct. (Pl.'s Br. in Opp. at 25.) Pease states that the Seventh Circuit has recognized two forms of constructive discharge: (1) when the working environment

12

becomes unbearable and (2) when an employee reasonably believes his termination is imminent. (*Id.*) In actuality, the first form of constructive discharge is when an employee resigns due to alleged discriminatory harassment that has made the working environment unbearable. *Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 679 (7th Cir. 2010). Pease is correct, though, that the second form is when "an employer acts in a manner so as to have communicated to a reasonable employee that [he] will be terminated." *E.E.O.C. v. Univ. of Chicago Hosps.*, 276 F.3d 326, 332 (7th Cir. 2002). However, under either form, a plaintiff must show that "the work environment had become intolerable." *Chapin*, 621 F.3d at 679.

In this case, Pease does not allege that he personally faced discrimination; thus, he cannot establish constructive discharge under the first form. Rather, he must put forth evidence showing that his employer acted in a manner so as to have communicated to a reasonable employee that Pease will be terminated. Under this second form, an employee need not "sit in the corridor while waiting for someone to say 'you have been fired,'" or remain on the job while "relegated to menial tasks and the employer makes it clear that no better treatment can be hoped for." *Cigan v. Chippewa Falls Sch. Dist.*, 388 F.3d 331, 333 (7th Cir. 2004). Pease relies solely on the May 28, 2019 newspaper article stating that he was "out" as Athletic Director as evidence that he reasonably believed he was going to be terminated. (Pl.'s Br. in Opp. at 27.)

The record evidence, however, shows that Pease intended to resign prior to the publication of the May 28, 2019 article. Pease admits that during a May 21, 2019 meeting with Elworthy, Elworthy stated that the District would be willing to consider a voluntarily resignation prior to completing the District's review and a "final decision regarding [Pease's] employment with the district" and that Pease told Elworthy at this meeting that "I

13

will tell you that I'm resigning." (Stephens Decl. ¶ 6, Ex. D, Pease's Resp. to Defendants' Requests for Admission Nos. 18–19, Docket # 63-4.) *See* Fed. R. Evid. 36(b) ("A matter admitted under this rule is conclusively established unless the court, on motion, permits the admission to be withdrawn or amended."). Furthermore, an email sent by Pease to Elworthy and Lovenberg on May 23, 2019 states that, "In regards to my resignation, I wanted to let you know that a representative for me will be reaching out to you to move this forward." (Docket # 63-20 at 1.) Thus, the evidence shows that the District had not yet made a determination regarding Pease's employment status, but wanted to give Pease the option of resigning if he wished to avoid an investigation. Pease clearly chose to resign on May 21, even if he did not officially tender his resignation until May 28.

Additionally, Pease cannot show that his working conditions were intolerable. For one, even if Pease believed he would be fired, "a working condition does not become intolerable or unbearable merely because a 'prospect of discharge lurks in the background.'" *Chapin*, 621 F.3d at 679 (quoting *Cigan*, 388 F.3d at 333). Showing an unbearable work environment "requires evidence that quitting was the only way the plaintiff could extricate [himself] from the intolerable conditions." *Gawley v. Indiana Univ.*, 276 F.3d 301, 315 (7th Cir. 2001). "[U]nless conditions are beyond 'ordinary' discrimination, a complaining employee is expected to remain on the job while seeking redress." *Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1015 (7th Cir. 1997).

While Pease testified that he believed "they went after [his] son" (Sept. Pease Dep. at 179) and that "they took away me seeing my kids' last games played" (*id.* at 185–86), Pease admits that Elworthy told him that he could attend events "as a parent," though he was expected to provide notice to Lovenberg first (Pease's Resp. to Defendants' Requests for

14

Admission No. 20). And Pease provides nothing beyond speculation that the parents' and students' complaints about bullying by Pease's son were fabricated to force Pease to resign. In fact, Pease testified that he did not know about Brokopp's investigation into the bullying complaints until July 2019. (Sept. Pease Dep. 195.) For these reasons, Pease cannot show that he was constructively discharged.

Given the complete lack of evidence supporting that Pease engaged in a statutorily protected activity and was constructively discharged, Pease cannot show that a reasonable jury could find a but-for causal connection between the two. As such, Pease's Title IX retaliation claim fails. Summary judgment is granted in defendants' favor.[2]

2. *Remaining State Law Claims*

With the dismissal of Pease's Title IX retaliation claim, all that remains are Pease's claims arising under Wisconsin law. I will follow the general rule by relinquishing jurisdiction over the supplemental state law claims. *See Redwood v. Dobson*, 476 F.3d 462, 467 (7th Cir. 2007) ("A court that resolves all federal claims before trial normally should dismiss supplemental claims without prejudice."). Thus, Pease's state law claims are dismissed without prejudice.

# CONCLUSION

Pease alleges that his former employer retaliated against him for opposing discrimination in violation of Title IX. On this record, however, no rational trier of fact could find in Pease's favor on this claim. For this reason, summary judgment is granted in

---

[2] Defendants alternatively moved for dismissal of Pease's lawsuit based on Pease's alleged spoliation of the Native File of his resignation letter. (Defs.' Br. at 42–54.) Much ink was spilled over this issue and much court time was expended. As it turns out, having the Native File of the resignation letter was unnecessary for resolution of the Title IX claim. Given my finding on the Title IX claim, I will not address the spoliation argument any further. I will also not award Defendants costs or fees related to this issue, as both parties equally contributed to the excess litigation on this issue and seemingly equally misconstrued the importance of the Native File to the issue at hand.

the defendants' favor and against Pease. I decline to exercise supplemental jurisdiction over Pease's remaining state law claims and dismiss those claims without prejudice.

ORDER

**NOW, THEREFORE, IT IS ORDERED** that the Defendants' Motion for Summary Judgment (Docket # 57) is **GRANTED**. Pease's Title IX Retaliation Claim (Count 1) is dismissed. Pease's state law claims (Counts 2, 3, and 4) are dismissed without prejudice.

**IT IS FURTHER ORDERED** that both parties' motions for leave to file excess pages (Docket # 77) and (Docket # 87) are **GRANTED**.

**IT IS FURTHER ORDERED** that Defendants' Motion for Leave to Amend Defendants' Proposed Findings of Fact (Docket # 88) is **GRANTED**.

**IT IS FURTHER ORDERED** that the clerk of court will enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 7th day of March, 2022.

BY THE COURT:

_____
NANCY JOSEPH
United States Magistrate Judge